THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA
2007 NOV 14 PM 7:07
NANCY M.
MAYER-WHITTINGTON
CLERK

GARY HAMILTON,
Plaintiff                          )

v.                                 )
                                   )    CASE NO.: 05-cv-1549 (RBW)
HENRY M. PAULSON                   )
Defendant                          )    07-1365

---

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER TO THE EASTERN DISTRICT OF VIRGINIA

Pro Se Plaintiff, Gary Hamilton, files his Opposition to Defendant's Motion to Dismiss or in the alternative to transfer to the Eastern District of Virginia and states that this Court should not transfer this case to the Eastern District of Virginia because first of all, Plaintiff has a pending and related matter in this court and from which this particular case grew. Secondly, the mediation and other events having operative significance in this case, occurred in the District of Columbia. Thirdly, the interest of justice requires that this matter remain in this court. Finally, the allegations in this case survive a motion to dismiss. For these reasons, this Court should deny the Defendant's motion.

### There is a Related Case Pending Before This Court

Under the Local Rules of this court, specifically, LcvR 40.5, "cases are deemed related when the earliest is still pending on the merit in the District Court and they (i) related to common property, or (ii) involve common issues of fact or (iii) grow out of the same event or transaction or (iv) involve the validity of infringement of the same patent.

Notwithstanding the foregoing, a case filed by a pro se litigant with a prior case pending shall be deemed related and assigned to the judge having the earliest case".

The pro se plaintiff in this case has another case currently pending before this Court.  The case is Hamilton v. Snow; Case Number 05-1549.  At the time the instant case was filed, this pro se plaintiff indicated on the form provided by the Clerk, the name, docket number and relationship of the pending case in this court .  That form was served on the defendant with the complaint pursuant to LcvR R 40.5 (b) (2).  This rule requires that the defendant file his objection to the related case designation with his first responsive pleading of motion.  Defendant however failed to file his objections to the related case designation as required by the rule.  Rather, defendant filed a motion to dismiss or in the alternative to transfer the case to the Eastern District of Virginia.  This simply means defendant does not object or that defendant waived its objection to the related case designation.  By not filing his objections in a timely manner, defendant has agreed that the two cases are related and his motion to dismiss or transfer my case to Virginia does not make sense.  If this Judge allows this case to be transferred to Virginia, the Judge in Virginia will be forced to inquire into and about my case already pending before this Court.  As I understand it, that will undermine "the interest of judicial economy" because the Judge in Virginia knows nothing about my pending case.  He will have to learn it anew.  But because your Honor already understands this case, He will see where I am coming from and make the right decision.  As a result, keeping this particular case with this particular Judge is the only sensible thing to do.  Defendant's forum shopping should not be allowed to stand.

2

In addition to that, the instant case grew out of the pending case before this Court. In paragraph 6 of the Complaint, I allege that "On or about August 2005, Plaintiff filed a discrimination complaint against the defendant in the United States District Court for the District of Columbia". That Complaint which is Case Number 05-1549 RBW, is the basis for my retaliation case in this case. This is so because I initially filed a complaint with the EEOC. I notified the defendant that I would be withdrawing that complaint and filing my complaint in the U.S. District Court. In the meantime, I applied for one of the positions announced in this case. Defendant did not act on my application. I filed my complaint in the District Court for the District of Columbia. Rather than act on the application, defendant continued to seek applicants. Upon phoning defendant personnel to be told that my application was lost, I faxed another application similar to the originally mailed application, but not the exact version as originally mailed to defendant. It was not until I faxed to the defendants' agent (personnel office) a copy of my certified mail receipt that I was eventually allowed to fax a copy of my application package for consideration. It is my assertion that defendant pre-arranged and set in motion a deniable (e.g, by simply stating that my application was never received)) scheme to deny me consideration for promotion. The defendant scheme was imperiled or otherwise sub-verged because I submitted my application via certified mail, something that the defendant never expected. This is particularly true since applicantions are rarely forwarded by certified mail, and defendant did not expect my applications via certified receipt request. I did so because of two reasons. Number 1: I highly suspected that the defendant will continue to retaliate against me and would do anything to stop me from being considered, much less promoted; and, Number 2: The organization (e.g.,

3

personnel office) responsible for processing the contested promotional applications were formerly (prior to about six months) within the managerial span of control of the same officials named in my instant complaint. One of the defendants' personnel agent, Ms Maria Mims emailed me on July 12, 2005 stating:

"That a clerk in her area signed for a certified letter on 4-13-05. Included (emphasis added) was your application for> DEU-AT5RF100E. This position was announced by an HR Assistant, Rhonda Fuller. The HR Specialist, Bonnie Robinson later confirmed that your application was not received."

The question becomes, if indeed my application was received as noted in the email from Ms Mims, then why was it not used during the ranking, rating and selection process, but instead my replacement faxed version.

Also, not only are the two cases related, they involve common issues of fact. The common issues of fact are nonselection, discrimination and retaliation. In the first case, I allege discrimination and retaliation. This case involves that issue as well. That claim is also present in this case. The historical background in the first discrimination and retaliation case is always allowable for use and will be readily available for this Judge if the case were kept here where it belongs. On the other hand, a Virginia judge will have to go through some hurdles to obtain the right information needed for the case and may never be able to get the information. To nail it all on the head, this case belongs here with this Judge and defendant's motion should be denied.

## The Mediation in This Case Occurred in The District of Columbia

About February 10, 2006, the parties in this case met in the District of Columbia to mediate this case. I appeared in D.C. for the mediation on February 10, 2006. The mediation is an event having operative significance in this case. It was a forum where we (myself and the defendant) were asked to tell our sides of the story; compromise on our

claims and be ready to resolve the matter amicably. Mr. Falcone who was mentioned in my complaint in this case was present. See Exh. 4. The mediation lasted about one half day. If everything had gone right, the matter would have ended right there and then. In that event, defendant would hardly be able to say, nothing about the case happened in the District of Columbia or that D.C. is irrelevant to the case. It is my position that the mediation of February 10, 2006, was an event having operative significance in this case. If the District of Columbia had no connection with this case, the defendant would not have mediated the matter there. He would have insisted on Virginia as the right forum for the mediation. In fact, Mr. Falcone works in the Headquarters office of IRS in DC. Mr. Falcone is implicated in my complaint. See exhibit 2. Mr. Falcone is a material witness in this case. Therefore, that fact, coupled with the fact that defendant himself mediated the matter in the District of Columbia is defendant's own admission that District of Columbia is not only relevant but very important to the case and is the appropriate forum. See Exh. 4.

## Questioning of The Plaintiff About This Case And Its Relatedness to the Pending Case Occurred In The District of Columbia

On top of that, I was deposed in my first pending federal court case in August of 2006, and again deposed again during an administrative (EEOC) proceeding sometime in 2004. Both depositions occurred within the District of Columbia. On top of that, defendant participated in an alternate dispute resolution (ADR) on May 16, 2005 in the District of Columbia. Exh. 5. During my August of 2006 deposition, defense lawyer asked many questions about this particular case. The questions asked during deposition delved into how the two cases are related. See Exh. 3 p. 157. Specifically, the

deposition testimony reveals that the first (pending) case is the origin of this case and that it is from that case that this case grew or developed.   Furthermore, the questions asked during prompted the revelation that the agency officials mentioned in my first case, combined with the agency officials mentioned in this case, are all jointly responsible for my removal from the agency.  See Exh. 3 p. 19.  It is Plaintiff's position that such questioning me in the District of Columbia about the present case, was also an event having operative significance in this case.  If D.C. was not relevant or unconnected to this case, defendant would not have asked me questions about this case in D.C. Also, defendant would have objected to the venue selected by me during the first case, but it never did and therefore waived it.

Apart from that, Plaintiff met with one of the officials mentioned in the complaint in this case , namely Mr. Reagan in D.C. at defendants' Headquarters to discuss the vacancy announcement, in addition to stating desire to be promoted in this case.  Mr. Reagan  told me that I did not have to apply and that it was no use. See Exhs. 1 & 2. This is an important part of the case as already stated in my declaration. See Exh. 2. This discussion goes to the heart of the case and (partly) forms that basis on which my claim rest.  With that, one can hardly conclude that D.C. is not important to this case. Nor can one conclude that the right forum is anywhere other than D.C.

## Plaintiff Regularly Worked In The District of Columbia

Contrary to the defendant's assertion, Plaintiff worked in D.C. throughout the period he was employed with the IRS. While it is true that I was stationed in New Carrollton, Maryland, I went to D.C. at least once or twice per month to conduct air quality inspection.  Those visits were documented both in Maryland and D.C. Therefore,

6

defendant's assertion that I worked only in Maryland is erroneous. Additionally, I developed and wrote the IRS Territory's (Washington DC Metro) Facility Safety Inspection Processes and Procedure Policy, which is used not just in Maryland but also in the entire Washington, Metropolitan area. As a result, the fact that I regularly work in D.C. combined with the fact that my work product is used throughout the D.C. area are important to the determination of appropriate venue for this case. D.C. is the right forum.

## Plaintiff's Complaint Survives Defendant's Motion to Dismiss

Defendant moved for the dismissal of plaintiff's claim pursuant to _Federal Rule of Civil Procedure 12(b)(6)_. (See defendant's motion on page 1 last line). To survive a motion to dismiss based on this rule, a complaint need only provide " a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." _Conley v. Gibson_, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (citing _Fed.R.Civ.P. 8(a)_). When reviewing such a motion to dismiss, the court must accept as true all the factual allegations contained in the complaint. _Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit_, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). A motion to dismiss under Rule 12(b)(6) tests not whether a plaintiff will ultimately prevail on the merits, but only whether the plaintiff has properly stated a claim for which she or he is entitled to relief. _Woodruff v. DiMario_, 197 F.R.D. 191, 193 (D.D.C.2000). Specifically, a complaint in an employment discrimination lawsuit does not need to assert specific facts to establish a prima facie case of discrimination, but need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." _Swierkiewicz v. Sorema_, 534 U.S. 506, 508,

122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing Fed.R.Civ.P. 8(a)(2)); _Sparrow v. United Air Lines, Inc._, 216 F.3d 1111, 1115 (D.C.Cir.2000). Thus, a complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] \fs24softlinewhich would entitle [them] to relief." _Conley_, 355 U.S. at 45-46, 78 S.Ct. 99.

In ruling upon the defendants' motion to dismiss for lack of proper venue, the Court "accepts the plaintiffs['] well-pled factual allegations regarding venue as true, ... draws all reasonable inferences from those allegations in the plaintiffs['] favor, and ... resolves any factual conflicts in the plaintiffs['] favor.... The court, however, need not accept the plaintiffs['] legal conclusions as true." _James v. Booz-Allen, Hamilton, Inc._, 227 F.Supp.2d 16, 20 (D.D.C.2002) (citation omitted). A motion to dismiss under Rule 12(b)(6) tests not whether a plaintiff will ultimately prevail on the merits, but only whether the plaintiff has properly stated a claim for which she or he is entitled to relief. _Woodruff v. DiMario_, 197 F.R.D. 191, 193 (D.D.C.2000). Specifically, a complaint in an employment discrimination lawsuit does not need to assert specific facts to establish a prima facie case of discrimination, but need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." _Swierkiewicz v. Sorema_, 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing Fed.R.Civ.P. 8(a)(2)); _Sparrow v. United Air Lines, Inc._, 216 F.3d 1111, 1115 (D.C.Cir.2000). Thus, a complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." _Conley_, 355 U.S. at 45-46, 78 S.Ct. 99. _Quarles v. General Investment & Development Co._ 260 F.Supp.2d 1, D.D.C.,2003.

8

As I understand (if I do) these legalese, this Court cannot dismiss my complaint unless it appears beyond doubt that I can prove no set of facts in support of the allegations in the complaint. Defendant has not shown, neither can it show that I can prove no set of facts in the complaint. Defendant is a branch of the federal government and has its headquarters in Washington, D.C. Defendant has not claimed (nor can it claim) that this Court has no jurisdiction over this case. Also, the Court has to accept my allegations as true (and they are true). Additionally, my complaint gives the defendant fair notice of my claim and the grounds upon which it rests This is a discrimination and retaliation complaint and the complaint states a claim for which relief can be granted. Also, the allegations in my complaint show that I am entitled to relief. (See complaint in file) Therefore, this complaint should not be dismissed. For the same reason, it should not be transferred.


## The Interest of Justice Warrants That this Matter Remain in this Court.

Defendant uses 28 U.S.C. § 1406(a) as his basis for requesting the transfer of this case. 28 U.S.C. § 1406(a) reads: (a) The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought. A court usually grants a motion to transfer when: (1) the moving party first establishes that the action could have been brought in the proposed transferee district, and (2) the moving party has demonstrated that the balance of convenience of the parties and witnesses and the interest of justice are in their favor. 28 U.S.C.A. §

1404(a). Great Socialist People's Libyan Arab Jamahiriya v. Misky 496 F.Supp.2d 137 (D.D.C. 2007) citing Lentz v. Eli Lilly and Co. 464 F.Supp.2d 35 D.D.C.,2006. To succeed on a motion to transfer, defendant must first establish that the action could have been brought in the proposed transferee district, DeLoach v. Philip Morris Co., 132 F.Supp.2d 22, 24 (D.D.C.2000). Second, it must "demonstrate that the balance of convenience of the parties and witnesses and the interest of justice are in their favor." Consol. Metal Prods., Inc. v. Am. Petroleum Inst., 569 F.Supp. 773, 774 (D.D.C.1983).

First of all, defendant is wrong in concluding that this case was filed in the wrong district. As indicated above, District of Columbia is relevant to this case. The law does not require that everything have occurred in the District of Columbia for this case to be properly brought there. Also there is nothing in 28 U.S.C. § 1406(a) that prohibits Plaintiff from selecting a forum that is convenient for the Plaintiff where the forum is equally convenient for all the parties. The fact that we mediated this case in D.C.; that I was questioned during two separate and distinct occasions about this case during deposition and again during my related case before an EEOC administrative proceeding in D.C.; combined with the fact that I approached one of the implicated agency officials, Mr. Reagan in D.C. to discuss one of the vacancies, in addition to state my desire for promotion in this case, all go to show that D.C. is very crucial to this case. For that reason, it is the appropriate (not the wrong) district in which this case should lie.

In addition to that, the courthouse that defendant wants this case transferred to is father than this court house to the defendant's office. Specifically, the distance between this court house and the defendant's Virginia office is 4.46 miles and takes only 8 minutes to drive. On the other hand, the distance between the defendant's office and the

Eastern District of Virginia court house is 4.72 miles and takes 12 minutes. This distance is about fifty percent longer than the distance to this court house. See Exhs. 6 & 7. To meet the burden of proving improper venue, the defendant must do more than merely raise a bare allegation that venue was improper. In this case, three of the defendant's agents have offered cursory affidavits containing mostly legal conclusions that: they are unaware of any records relating to the New Carrollton employees that were maintained in D.C. (Chadwick Pickeral); that they began working in September 2007 but that certain procedures (of which they had no personal knowledge) was followed in 2005 (Delores Lovejoy); and without denying that he met with Plaintiff in D.C. and even not knowing that Plaintiff met with Falcone, a material witness in D.C., simply swore that the Plaintiff would have worked in Virginia if he was hired (John Reagan). As already stated above, all the occurrences need not have taken place in D.C. for the D.C. to be the proper forum.

Again it makes absolutely no sense to require that the parties travel even farther than they would have to a different court only because it is in Virginia or only because the plaintiff would have worked in Virginia if he had been hired. See Exhs. 6 & 7. The purpose of the venue statute is convenience not burden. Defendant's motion imposes a additional undue burden on not just the witnesses but also the Plaintiff. Therefore, the balance of convenience of the parties and witnesses and the interest of justice are definitely not in defendant's favor. Defendant's contention that Eastern District, a farther forum, is the right forum has no validity in logic or law.

## Conclusion

The facts that there is a pending related case in this court, that several things of importance occurred in D.C., that I worked in D.C. regularly and my work product gets used in D.C. regularly; and that Eastern District of Virginia is farther in terms of distance and imposes additional burden rather than convenience all go against the idea of transferring this case from its right forum, which is D.C. For all these reasons, defendant's motion should be denied.

Respectfully submitted,

Gary Hamilton
Pro Se Plaintiff

## Certificate of Service

I certify that on this 14th day of November, 2007, I sent a copy of this Opposition to the defense counsel as follows:

Mr. Fred Haynes bar number 434122
AUSA
555 Fourth Street NW E-4110
Washington, D.C. 20530
202-514-7201


Gary Hamilton, Pro se plaintiff.

Exhibit 1

## AFFIDAVIT OF PLAINTIFF, GARY HAMILTON

1. I AM THE PLAINTIFF IN THIS CASE WITH CASE NO. 07-1365-RBW. I AM ALSO THE PLAINTIFF IN CASE NO. 05-1579-RBW WHICH IS A PENDING CASE BEFORE THIS COURT.

2. I FILED MY FIRST CASE IN YEAR 2005 BASED ON DISCRIMINATION AND RETALIATION. AS A RESULT OF THAT CASE, A SERIES OF RETALIATORY ACTS AGAINST ME FOLLOWED.

3. IT WAS SO BAD THAT I WAS FORCED TO FILE ONE COMPLAINT AFTER THE OTHER.

4. TO BE PRECISE, I INITIALLY FILED A COMPLAINT WITH THE EEOC. I NOTIFIED THE DEFENDANT THAT I WOULD BE WITHDRAWING THAT COMPLAINT AND FILING MY COMPLAINT IN THE U.S. DISTRICT COURT. IN THE MEANTIME, I APPLIED FOR ONE OF THE POSITIONS ANNOUNCED IN THIS CASE.

5. DEFENDANT DID NOT ACT ON MY APPLICATION. I FILED MY FIRST COMPLAINT IN THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA. THAT IS THE PENDING CASE WITH CASE NUMBER 05-1549-RBW. RATHER THAN ACT ON THE APPLICATION, DEFENDANT CONTINUED TO SEEK APPLICANTS.

6. UPON PHONING DEFENDANT PERSONNEL TO BE TOLD THAT MY APPLICATION WAS LOST, I FAXED ANOTHER APPLICATION SIMILAR TO THE ORIGINALLY MAILED APPLICATION, BUT NOT THE EXACT VERSION AS ORIGINALLY MAILED TO DEFENDANT. IT WAS NOT UNTIL I FAXED TO THE DEFENDANTS' AGENT (PERSONNEL OFFICE) A COPY OF MY CERTIFIED MAIL RECEIPT THAT I WAS EVENTUALLY ALLOWED TO FAX A COPY OF MY APPLICATION PACKAGE FOR CONSIDERATION.

7. IT IS MY ASSERTION THAT DEFENDANT PRE-ARRANGED AND SET IN MOTION A DENIABLE (E.G, BY SIMPLY STATING THAT MY APPLICATION WAS NEVER RECEIVED)) SCHEME TO DENY ME CONSIDERATION FOR PROMOTION. THE DEFENDANT SCHEME WAS IMPERILED OR OTHERWISE SUB-VERGED BECAUSE I SUBMITTED MY APPLICATION VIA CERTIFIED MAIL, SOMETHING THAT THE DEFENDANT NEVER EXPECTED. THIS IS PARTICULARLY TRUE SINCE APPLICANTIONS ARE RARELY FORWARDED BY CERTIFIED MAIL, AND DEFENDANT DID NOT EXPECT MY APPLICATIONS VIA CERTIFIED RECEIPT REQUEST.

8. I DID SO BECAUSE OF TWO REASONS. NUMBER 1: I HIGHLY SUSPECTED THAT THE DEFENDANT WILL CONTINUE TO RETALIATE AGAINST ME AND WOULD DO ANYTHING TO STOP ME FROM BEING

CONSIDERED, MUCH LESS PROMOTED; AND, NUMBER 2: THE ORGANIZATION (E.G., PERSONNEL OFFICE) RESPONSIBLE FOR PROCESSING THE CONTESTED PROMOTIONAL APPLICATIONS WERE FORMERLY (PRIOR TO ABOUT SIX MONTHS) WITHIN THE MANAGERIAL SPAN OF CONTROL OF THE SAME OFFICIALS NAMED IN MY INSTANT COMPLAINT. ONE OF THE DEFENDANTS' PERSONNEL AGENT, MS MARIA MIMS EMAILED ME ON JULY 12, 2005 STATING:

"THAT A CLERK IN HER AREA SIGNED FOR A CERTIFIED LETTER ON 4-13-05. INCLUDED (EMPHASIS ADDED) WAS YOUR APPLICATION FOR> DEU-AT5RF100E. THIS POSITION WAS ANNOUNCED BY AN HR ASSISTANT, RHONDA FULLER. THE HR SPECIALIST, BONNIE ROBINSON LATER CONFIRMED THAT YOUR APPLICATION WAS NOT RECEIVED."

9.   THE QUESTION BECOMES, IF INDEED MY APPLICATION WAS RECEIVED AS NOTED IN THE EMAIL FROM MS MIMS, THEN WHY WAS IT NOT USED DURING THE RANKING, RATING AND SELECTION PROCESS, BUT INSTEAD MY REPLACEMENT FAXED VERSION.

10.   ANYWAY, SINCE MY PENDING CASE WAS ALREADY IN LITIGATION, DEFENDANT DID NOT SELECT ME FOR THE POSITIONS.

11.   FOR THE FIRST CASE, EVERYTHING , INCLUDING BUT NOT LIMITED TO MEDIATION, DEPOSITION, INTERVIEW AND EVENTUAL LITIGATION OCCURRED IN D.C.  AND DEFENDANT DID NOT OBJECT OR STATE THAT D.C. WAS THE WRONG VENUE.

12.   IN FEBRUARY OF 2006, MYSELF AND THE AGENCY MEDIATED THIS PARTICULAR CASE IN D.C. AT THE MEDIATION, MR. FALCONE, ONE OF THE AGENCY OFFICIALS RESPONSIBLE FOR  THE ALLEGED DISCRIMINATORY AND RETALITATORY  ACT WAS PRESENT. HE WORKS IN D.C. AT THE IRS HEADQUARTERS. THE MEDIATION LASTED ABOUT ONE HALF DAY.

13.  I WAS DEPOSED IN MY FIRST CASE IN AUGUST OF 2006.  DURING THAT DEPOSITION, DEFENSE COUNSEL ASKED NUMEROUS QUESTIONS THAT DELVED INTO THE PRESENT CASE AND HOW THIS CASE RELATES TO THE PENDING CASE.  I HAVE ATTACHED SOME OF THE PAGES OF THE QUESTIONS HE ASKED PERTAINING TO THIS CASE AS EXHIBIT 3.

14.  WHILE IT IS TRUE THAT I WAS STATIONED IN NEW CARROLLTON, MARYLAND, WHILE WORKING AT THE IRS, IT IS ALSO TRUE THAT I REGULARLY WENT TO D.C. AT LEAST ONCE OR TWICE PER MONTH TO CONDUCT AIR QUALITY INSPECTION.  THE VISITS WERE TO 1111 CONSTITUTION AVENUE N.W. AND 500 NORTH CAPITOL.  THOSE VISITS WERE DOCUMENTED BOTH IN MARYLAND AND D.C. THEREFORE,

DEFENDANT'S ASSERTION THAT I WORKED ONLY IN MARYLAND IS ERRONEOUS.

15. IN ADDITION TO THAT, I DEVELOPED AND WROTE THE IRS TERRITORY'S (WASHINGTON DC METRO) FACILITY SAFETY INSPECTION PROCESSES AND PROCEDURE POLICY, WHICH IS USED IN THE ENTIRE WASHINGTON METROPOLITAN AREA AND NOT JUST IN MARYLAND.

16. IN VERIFYING THE DEFENDANT'S POSITION, I WENT ONLINE AND USED MAPQUEST, WHICH IS A VERY COMMON AND REGULARLY USED MEANS TO OBTAIN THE DISTANCES AND DIRECTIONS BETWEEN DIFFERENT LOCATIONS. I HAVE ATTACHED IT AS EXHIBITS 6 & 7.

17. MAPQUEST SHOWS THAT THIS COURT HOUSE IN D.C. IS CLOSER TO THE DEFENDANT'S OFFICE IN VIRGINIA. IN ADDITION, TRAVELING FROM DEFENDANT'S OFFICE TO THE EASTERN DISTRICT OF VIRGINIA COURT HOUSE TAKES ONE TIME AND ONE HALF THE AMOUNT OF TIME IT WOULD TAKE ANYONE TO TRAVEL FROM DEFEDANT'S OFFICE TO THIS GREAT COURT HOUSE IN D.C.

18. I PRESENTLY LEAVE IN MARYLAND AND WORK IN D.C.

19. MR. FALCONE A MATERIAL WITNESS IN THIS CASE ALSO CURRENTLYWORKS IN D.C.

20. D.C. IS THE HEADQUARTERS FOR THE IRS OFFICE.

21. D.C. IS THE APPROPRIATE FORUM FOR THIS CASE. PLEASE DON'T TRANSFER IT.

I CERTIFY AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE ABOVE STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. I AM COMPETENT TO GIVE THIS AFFIDAVIT BEING OVER 50 YEARS OF AGE.

GARY HAMILTON, PRO SE PLAINTIFF
NOVEMBER 14, 2007.

Exhibit 1

*Exhibit 2*

# DECLARATION

**SUBJECT:** Discrimination Complaint of Gary Hamilton and Henry M. Paulson, Jr., Secretary of the Treasury, TD Case Number 06-2213M.

## AMENDED DECLARATION UNDER PENALTY OF PERJURY

In accordance with the procedures of 28 U.S.C. 1746, I, Gary Hamilton, the undersigned do hereby make the following declaration under penalty of perjury pertinent to the above stated subject

**Complainant:** Gary Hamilton (former employee)
**Representative:** Anne Gbenjo (713) 771-4775
yourlawgroup@yahoo.com

**State your name, agency, title, series, grade, duty location, and race.**

Gary Hamilton, U.S. Department of Labor, Occupational Safety and Health Administration (OSHA), Washington, DC, African-American (Black)

**Briefly state your former duties and responsibilities as an Industrial Hygienist, including the management official(s) to whom you reported and how long you held that position.**

Served as the industrial hygiene technical expert for IRS Area 3 ( which includes Greater metro DC and New Carrollton Territories ) for planning, coordinating and conducting detailed surveys and investigations relating to recognition, evaluation and formulation of controls for occupational, health hazards. Conducts or serves as team leader, directing surveys of worksites throughout the Washington DC facilities, to identify and evaluate the potential for excessive exposure to toxic materials and harmful physical agents found in the workplace. Additionally, I served as lead safety and health inspection program for the New Carrollton Territories - assignments include conducting evaluations of a variety of industrial environments, including heavy industry or highly complex research and development work, and involve the identification and evaluation of hazards about which little may be known. Surveys measuring airborne contaminants often involve combinations of exposures for which acceptable concentrations must be determined. Other complicating factors include new or unusual processes and difficult control problems, including bioterrorism events, etc.

**Describe your prior EEO complaint activity and include the following information: the TD Case number(s), basis(es), issue(s), management official(s) involved, and current status of the complaint(s).**

1. 04-2024;  Management official: John Stuart Burns; The Agency  on or about August 2003 based on race, gender and color planned, arranged and executed with a discriminatory motive by:

Page 1 of 9

## DECLARATION

- Selecting a white female with observably/demonstrably less qualifications for a position of safety and health specialist, GS-0018-14.
- Planning, arranging and executing with a recruitment, ranking and selection action to give the same white female preferential treatment by giving her a detail into the position.
- Planning, arranging and executing the selection process using an evaluation process with a discriminatory motive that is subjective in nature to form an otherwise (pretext) defensible legitimate selection process.

2. 04-2430; Management Official :John Stuart Burns; Issue is that the Agency based on my race, color and sex on or about January 2004 planned, arranged and executed with a retaliatory motive by:
- Recruiting and selecting a white female to a 120 day temporary non-competitive promotional detail of 120 days.  This white female selected was from my immediate workgroup.

3. 05-2385;  Issue: The Agency Selecting Official (SO), John Stuart Burnes named in Claims 1 and 2 above, with a retaliatory motive:
- Made disparaging statements about the Complainant's assignment performance as  a "preliminary step as part of a pattern of harassment" that had already affected the Complainant.

## State your allegations regarding the disparate treatment and retaliation.

(a) Was the complainant discriminated against based on his race and (b) did the complainant suffer retaliation based on his prior EEO activities when:

1(a).  The Agency filled the two positions that the Complainant applied for i.e., the Industrial Hygienist position (GS-0690-14; 15-02-AT5G693; DEU-AT5RF100E) and the Environmental Protection Specialist  (EPS) position (GS-0018-14; 15-02286N5CE; 05KCD25127F1698) about December of 2005, after the Complainant left his employ; where the Complainant believes that the Agency deviated from its job announcement procedure in advertising for EPS position or that the Agency made it difficult if not impossible for him to apply for the Environmental Protection Specialist position (GS-0018-14; 15-02286N5CE; 05KCD25127F1698).

1(b) The Agency informed the Complainant that his application package for the Industrial Hygienist position (GS-0690-04; 15-02-AT5G693; DEU-AT5RF100E) was lost when he inquired about the status of his application; and the Agency continued to seek applicants for that position though the Complainant, following the Agency's directive, re-sent his application to the Agency.

Page 2 of 9

# DECLARATION

(2). Whether the Complainant was constructively discharged from his employ about December of 2005 based on his claims of discrimination and retaliation in employment.

**Regarding (1) and (2) cited above, describe in chronological order all of the events that led up to the allegation, including who committed the alleged discrimination, what occurred, where and when it occurred.**

Around December of 2005, after the Complainant had left his employ, the Agency filled the two positions that the Complainant had previously applied for i.e., the Industrial Hygienist position (GS-0690-14; 15-02-AT5G693; DEU-AT5RF100E) and the Environmental Protection Specialist (EPS) position (GS-0018-14; 15-02286N5CE; 05KCD25127F1698.

Regarding the Environmental Protection Specialist (EPS) position (GS-0018-14; 15-02286N5CE; 05KCD25127F1698, which was announced in around September of 2005, the agency made it impossible for the Complainant to apply for that position and eventually closed it.

As to the Industrial Hygienist position (GS-0690-04; 15-02-AT5G693; DEU-AT5RF100E), which was announced around March/April of 2005, the Agency informed the Complainant that his application package was lost when he inquired about the status of his application. Nonetheless, the Agency continued to seek applicants for that position though the Complainant, following the Agency's directive, re-sent his application to the Agency.

The continuous discriminatory and retaliatory acts in his work environment forced the Complainant to leave his employ around December of 2005.

**As an Industrial Hygienist, were you a bargaining unit employee?**
No

**When did you first become aware of the vacancy announcements and how were you made aware of them?**

■ The Industrial Hygienist position was advertised on the Agency Intranet sometime about March 2005, in addition to being cascaded by email from the REFM HQs staff assistant to Territory Managers (formers Facilities Management Officers), for eventual dissemination to line employees.

■ The Environmental Protection Specialist (EPS) position, the Complainant was informed on or about October 2005 during a casual telephone conversation with an IRS employee.

Page 3 of 9

## DECLARATION

**What are the guidelines regarding notifying employees of vacancy announcements when absent from the workplace?** *Please provide a copy.*

The IRS Merit Promotion Plan (8/2002) @ 6.335.1.12.5 (Application for Vacancy Announcement Consideration), states that:

> "The immediate manager ensures that a method is in place to ensure that employees who are temporarily absent from duty (i.e., leave, training, furlough, etc) are informed of vacancies announced within their area of consideration".

**What was REFM's "normal practice of emailing vacancy notices"?** *Please provide a copy of any documentation regarding the normal practice.*

Within the Division's HQs, the staff assistant had a pattern and practice of forwarding emails of all vacancies to the Territory Managers (formerly Facilities Management Officers) in field locations for eventual passing to line employees. Additionally, the REFM, Area 3 (DC Metro), Staff assistant augmented this notification by also cascading email notifications of vacancies to Area 3 Territory Managers for same purpose.

**Why do you believe the Agency purposely announced vacancies when you were scheduled to be out of the office?**

First, this particular allegation relates only to the environmental protection specialist position.

**Who scheduled you out of the office, when, and where were you at the time the vacancies were announced?**

Mr. John Reagan, as Chief of Safety and Mail Services, REFM HQs played a decisive role in the scheduling of safety program evaluations among the various Agency Territories or field offices.

**Who was your first-line manager and what involvement did (s)he have in these matters?**

Mr. Chadwick Pickeral.   He insisted on the location that I had to go to.

**Be specific and state who you believe subjected you to disparate treatment due to their actions in these matters.** *(Provide their name, title, complete details regarding their direct involvement in the vacancy announcements.)*

Page 4 of 9

# DECLARATION

Mr. John Reagan, Chief of Safety, REFM HQs, IRS, Arlington, Virginia: Mr. Reagan (successor to Mr. John Stuart Burns, named in Complainant's prior EEO complaints discussed in response Number 3).

Mr. Jim Falcone; Director of REFM, IRS, Arlington, Virginia. Mr. Reagan.

Mr. Reagan and Mr. Falcone with discriminatory and retaliatory motive facilitated or otherwise under color of authority arranged and influenced the timing of the EPS vacancy announcement in such a way to make it impossible for the Complainant to apply. This is supported by their knowledge of the timing of the training, which was sponsored by Mr. Falcone, in which he was present during the week and coupled with the knowledge of the Complainant's off-site responsibilities, immediately following training in San Diego, CA. Mr. Regan implied that it would be a waste of time to apply and Mr. Falcone also said they could advertise the position any way they want to.

**Describe your working relationship to the manager(s) who had direct involvement in this matter and the duration of the relationship.**

Mr. Falcone, Director of REFM HQ. interacted with Complainant during EEO ADR interaction.

Mr. John Reagan was Chief of Safety and Mail Services, REFM, IRS . The Complainant twice told Mr. Regan that he was interested in the position. His other interactions with Mr. Reagan were usually through his immediate supervisor.

**What reasons, if any, were given to you for the manager's actions in this matter? Who provided those reasons and when were they provided?**

No reasons have been provided yet.

**Why do you believe the reasons provided are not the real reasons and why do you believe that?**

I was not provided any reason.

**Why do you believe the real reason was to subject you to disparate treatment on the basis of your race and/or retaliation due to your prior EEO activity?**

*Industrial Hygienist Recruitment:*

▪The Agency claims it lost my application.

Page 5 of 9

## DECLARATION

- Mr. Reagan acknowledged that he was aware of my prior EEO activity on two occasions as discussed above

- Mr. Reagan held up processing the Industrial hygienist certificate best qualified (BQ) certificate for several months, July to December 2005. OPM rules requires cancellation of any BQ certificate when no selection has been made in 120 days.

- Mr. Reagan waited until I was forced out to select on this recruitment certificate.

- Mr. Reagan and Mr. Falcone chose to fill the positions with two outsides candidates of their race while pending EEO claim investigations were ongoing and others were filed with the federal court and one month after emailing the Business Unit (AWSS) Chief of his attempt to mediate and resolve long standing discrimination and reprisals within REFM.

### Environmental Protection Specialist:

- Mr. Reagan and Mr. Falcone arranged the deviation from the long standing pattern and practice of emailing vacancies to Territory/Field Managers for eventual distribution to employees.

- Mr. Reagan and Falcone intentionally advertised the EPS position while Complainant was off-site and on travel. Further, such action was not coincidental especially, given the fact that Mr. Falcone and Mr. Reagan were well aware of Complainant's superior qualifications for both the industrial hygiene and EPS positions. Additionally, Mr. Falcon said they could advertise the position any way they want to.

- Mr. Reagan and Mr. Falcone waited until I was forced out to select on this recruitment certificate.

- Mr. Reagan and Falcone chose to fill the positions with an outside candidate of their race while pending EEO claim investigations were ongoing and others were filed with the federal court and one month after emailing the Business Unit (AWSS) Chief to attempt to mediate and resolve long standing discrimination and reprisals within REFM.

- Additionally, I believe (as to both recruitments) the real reason was to subject me to disparate treatment because the Agency's Area-wide Shared Services (AWSS) employs a racially discriminatory, subjective and discretionary decision-making processes and practices affecting promotions and advancement opportunities that adversely impacts African American employees, especially Black Males. See Table Below.

Page 6 of 9

DECLARATION

| Category | Workforce Population | No. of Promotions | Promotion Rate (per 100 employees) |
|---|---|---|---|
| Black Male | 385 | [ 4% x 385] = 15 | 15/ [ 385/100] = 4 |
| Black Female | 1320 | [25% x 1320] = 317 | 317/ [1320/100] = 24 |
| White Male | 1650 | [11% x 1650] = 182 | 182/ [1650/100] = 11 |
| White Female | 2145 | [49% x 2145] = 837 | 837/ [2145/100] = 39 |
| Whites | 3795 | [60% x 3795] = 2277 | 2277/ [3795/100] = 60 |
| Blacks | 1705 | [29% x 1705] = 494 | 494/ [1705/100] = 29 |

Conclusion: These results indicate a vast disparate impact with respect to rate of promotions among the different racial and/or gender groups. Overall the promotion rate of whites is slightly over two (2.1) times that of Blacks. The promotion rate of White females is nine and three-quarters (9 ¾) times that of Black males. The promotion rate of White females is over one and one-half (1.6) times that of Black females.

Source: Internal Revenue Service (IRS), Agency-wide Shared Services (AWSS), Affirmative Employment Plan (AEP), Page 30

**What are the rules, regulations, policies, and/or procedures regarding posting vacancy announcements? Did management follow the guidelines in your situation? If not, how was it different? Provide a copy of the guidelines you make reference to.**

All relevant regulations, policies and/or procedures are contained in the Agency Merit Promotion IRM 6.335.1.12.4 or prevailing OPM regulations.

**What are the rules, regulations, policies, and/or procedures regarding notifying employees about current vacancy announcements? Did management follow the guidelines in your situation? If not, how was it different? Provide a copy of the guidelines you make reference to.**

Please see the responses above

Page 7 of 9

# DECLARATION

Considering that the position of EPS is one requiring specialized experience and technical qualifications, which the Complainant possessed superior qualifications, were not otherwise likely to be available within the Agency and not already a GS- 14, the Agency did not extend consideration to both internal and external candidates, contrary to normal practice as discussed in the response above, including the divergence from the cascading of email notification to line employees with REFM.

**Provide a copy of the last personnel action separating you from the Agency (discharge, resignation, termination, etc.).**

I was constructively discharged.

**Explain "constructive discharge" and why you believe you were subjected to it. Who do you believe caused the "constructive discharge" (specifically, who are they and exactly what did they do and when did they do it?).**

Please see the responses above

**Who initiated the action that separated you from your Agency? Did you provide the Agency something in writing? If so, provide copies.**

Please see the responses above

**Describe your working relationship to the manager(s) who had direct involvement in this matter and the duration of the relationship.**

Please see the responses above

**What reasons, if any, were given to you for the manager's actions in this matter? Who provided those reasons and when were they provided?**

Please see the responses above

**How have you been harmed by these events?**

I have suffered humiliation, indignity and have been emotionally traumatized by these events. Additionally, I have experienced exacerbation of my health conditions.

**What remedy are you seeking?**
Compensatory damages to the fullest extent allowed by law; Attorney fees; Front Pay and other remedies that I am or may be entitled to under the law.

I declare under penalty of perjury that the foregoing is true and correct.

Page 8 of 9

# DECLARATION

Considering that the position of EPS is one requiring highly technical qualifications which were not likely to be found within IRS, with an exception to the Complainant and not already possessing a GS-14, the Agency did not extend consideration to both internal and external candidates, contrary to normal practice as discussed in the response above.

**Provide a copy of the last personnel action separating you from the Agency (discharge, resignation, termination, etc.).**

I was constructively discharged.

**Explain "constructive discharge" and why you believe you were subjected to it. Who do you believe caused the "constructive discharge" (specifically, who are they and exactly what did they do and when did they do it?).**

Please see the responses above

**Who initiated the action that separated you from your Agency?  Did you provide the Agency something in writing?  If so, provide copies.**

Please see the responses above

**Describe your working relationship to the manager(s) who had direct involvement in this matter and the duration of the relationship.**

Please see the responses above

**What reasons, if any, were given to you for the manager's actions in this matter? Who provided those reasons and when were they provided?**

Please see the responses above

**How have you been harmed by these events?**

I have suffered humiliation, indignity and have been emotionally traumatized by these events. Additionally, I have experienced exacerbation of my health conditions.

**What remedy are you seeking?**
Compensatory damages to the fullest extent allowed by law; Attorney fees; Front Pay and other remedies that I am or may be entitled to under the law.

I declare under penalty of perjury that the foregoing is true and correct.

Page 8 of 9

## DECLARATION

Executed on this ___24th___ day of October 2006, at (city/state) Waldorf, Maryland.

_____
(Signature)

Name: Gary Hamilton
Title: Former Industrial Hygienist with IRS
Agency: Former employee of IRS/AWSS/REFM/Area 3
Mailing Address: P.O. Box 1201, Waldorf, MD  20604

Exhibit 3

18

1 Internal Revenue Service?

2          MS. GBENJO:  Objection.  Absolutely

3 irrelevant in this course of action.  There is no --

4 there is no constructive discharge claim here.

5 There is no involuntary separation claim here in

6 this case.  The record is clear that the only two

7 claims in this case is just non-selection based on

8 race and gender and retaliation.

9          BY MR. TRUONG:

10    Q.   Go ahead and answer the question, sir.

11    A.   Could you repeat it, please?

12    Q.   Sure.  Who is the responsible management

13 official involved in the involuntary discharge or

14 forcing you to leave involuntarily?

15          MS. GBENJO:  Well, that question assumes

16 there was just one person.

17          THE WITNESS:  Do you want me to name all

18 that I believe?

19          BY MR. TRUONG:

20    Q.   As many individuals that you believe

21 were involved in forcing you to involuntarily leave

22 the Internal Revenue Service.

19

1          MS. GBENJO:  My objection stands, but go

2  ahead and answer the question and tell him all the

3  people that you believe were involved.

4          THE WITNESS:  I believe John Regan.  I

5  believe Mr. Falcone.  I can't think of his first

6  name at this moment.  I believe Mr. Burns, John

7  Stuart Burns.  I believe William Herringer.  That

8  may be a mispronunciation of it, but that's part of

9  the record in my administrative complaint.

10          BY MR. TRUONG:

11      Q.   Anyone else?

12      A.   If I had my complaint -- I can't recall.

13  I can't recall.

14      Q.   Okay.  So you left the Internal Revenue

15  Service in December of 2005; is that correct?

16          MS. GBENJO:  Objection.  Asked and

17  answered.  He's answered that question twice.  Move

18  on.

19          BY MR. TRUONG:

20      Q.   Please answer the question, sir.

21          MS. GBENJO:  He already did.  You can

22  ask Madam Reporter to read it back to you.

157

1 from employment at Internal Revenue.

2          Q.    But this case doesn't deal with anything

3 with them forcing you out of the Internal Revenue

4 Service now, does it?

5          MS. GBENJO:  Objection.

6          THE WITNESS:  This case deals with an

7 origin of a continual practice into my current EEO

8 administrative investigation ongoing now.

9          BY MR. TRUONG:

10         Q.    Let me ask you -- rephrase the question.

11 Perhaps you didn't understand me, because your

12 answer was non-responsive.  Let me rephrase the

13 question.  Does this case seek any damages or

14 redress for forcing you out of the Internal Revenue

15 Service?

16         MS. GBENJO:  Objection.  That was not a

17 question that was asked.  Mischaracterizing the

18 witness' testimony.

19         THE WITNESS:  Can you restate the

20 question, please?

21         BY MR. TRUONG:

22         Q.    Does this case deal with anything that

Exhibit 3

*Exhibit 4* (handwritten)

## Confirmation of Mediation

(This form should be reviewed and completed at the beginning of the mediation session.)

This agreement confirms the request made by the aggrieved on __12/05/2005__ (date) to mediate certain issues between the Aggrieved and the Agency.

**Participation is Voluntary**
The participants understand that mediation is voluntary and any party may terminate the mediation at any time.

**Mediator is Not a Witness**
Each participant agrees not to subpoena any mediator. In no event will any mediator testify on behalf of either participant or participants for any purpose during successive steps of the administrative process or any court action.

**Role of the Mediator**
The parties understand that the mediator is not acting as an advocate or representative for either side.

No person may serve as a mediator if that person was previously involved in any way in issues surrounding the pre-complaint, or would be affected by a possible resolution of the issues. Mediators who are IRS employees are to mediate issues in functions or locations other than those in which they are employed. The EEO Counselor involved in the initial phase of the counseling should not be involved in the mediation process.

The mediator manages the mediation sessions and may meet with the participants together or separately during the process. He/she will determine the need for additional participants in the mediation, and will ensure that all participants are informed about the mediation process, including procedures and schedules.

The mediator will make no recommendation to the participants and will not provide a written record of positions. His or Her responsibility will be to facilitate resolution of the EEO issues raised by the participants.

**Mediation Process**
A mediation session lasts on the average from two to six hours, therefore, it is requested that the participants be available for that period of time. The purpose of the mediation process is to achieve a solution to the problem that satisfies all participants and eliminates any need for further action on anyone's behalf aside from those steps that may be agreed to as part of the resolution agreement.

**End of Mediation**
Mediation will be concluded when:

a. resolution agreement is signed by the management and resolution officials and the aggrieved and his/her representative;
b. the aggrieved withdraws the pre-complaint in writing; or
c. it is determined that the participants are unable to resolve the issues at hand and mediation is terminated.

**Unresolved Issues**
At the end of the mediation period, if no resolution has been achieved, the aggrieved will be given the right to file a formal complaint. This notice of right to file will be issued to the aggrieved by the counselor who will review the statutory requirement to proceed with the filing of a formal complaint.

The participants agree that the mediation has the right to end the mediation at any time if the mediator feels that the case is inappropriate for mediation or that further discussions would not be helpful.

**Confidentiality**
By signing the agreement, the participants indicate their awareness that mediation sessions are confidential. No participant shall disclose any of the discussions except for the limited purpose of implementation and enforcement of the agreement. If the participants reach a resolution, the agreement shall be reduced to writing and, when signed, shall be binding upon all participants to the agreement.

| Name of Aggrieved Party | Date | Name of Mediator | Date |
|---|---|---|---|
| Gary Hamilton | | | |
| Name of Co-Mediator | Date | Name of Representative | Date |
| | | | |
| Name of Management Official | Date | Title of Management Official | Date |
| | | | |
| Name of Resolution Official | Date | Title of Resolution Official | Date |
| James F Falcone | | | |

Form 13567 (4-2004)    Catalog Number 38322    publish.no.irs.gov    Department of the Treasury  Internal Revenue Service

12/05/05  17:21 FAX 202 283 7982          M:HQ:SS:P;P

Ø009

# Agreement to Extend Counseling/Participate in Mediation

This is an agreement, by the participants signing below, to participate voluntarily in mediation under the EEO Alternative Dispute Resolution (ADR) process, and to extend the 30-day counseling period for an additional 60 calendar days, not to exceed a total of 90 days. The allegations raised in the pre-complaint process will be, unless specifically excluded in writing, those submitted for attempted resolution by mediation.

**Release of Information**
Parts I and II of the EEO Counseling Report, if completed, will be given to the mediator or co-mediators, if requested.

**Participation is Voluntary**
The participants understand that participation is voluntary and any participant may terminate the mediation at any time.

**Mediator has No Decision Authority**
The participants further understand that the mediator or co-mediators have no authority to make decisions on issues raised nor act as an advocate or representative for either party. The aggrieved may consult with a designated representative. If resolution occurs as a result of mediation, the resolution agreement will be prepared in conformance with the established criteria as outlined in the ADR Program Guide.

**Mediator is Not a Witness**
Each participant agrees not to subpoena or request as a witness any mediator or request to use as evidence any materials prepared by the mediator for use during mediation with the exception of the signed resolution agreement. In no event will the mediator voluntarily serve as a witness or testify on behalf of either participant.

**End of Mediation**
The mediation will be concluded when:

  a. a resolution agreement is signed by the management and resolution officials and the aggrieved and his/her representative;
  b. the aggrieved withdraws the pre-complaint in writing; or
  c. it is determined that the participants are unable to resolve the issues at hand and mediation is terminated.

**Unresolved Issues**
If there are unresolved issues at the close of mediation, the mediator and the aggrieved will state them on an "Issues not resolved during mediation" form at the final mediation session. The aggrieved understands that any unresolved issues may be pursued through the discrimination complaint process. If mediation is unsuccessful, the aggrieved will be referred to the EEO/Diversity Office for completion of the counseling process, i.e. to be issued in the Notice of Right to File a Discrimination Complaint.

**Confidentiality**
The participants understand and stipulate that the mediation sessions are confidential and no participant shall disclose any of the discussions except for the limited purpose of implementation and enforcement of the agreement.

If the participants reach a resolution, the agreement shall be reduced to writing and, when signed, shall be binding upon all participants to the agreement.

| | |
|---|---|
| Name of Aggrieved Party | |
| Name and Title of EEO/Diversity Manager | **Date** 12/5/05 |
| Name and Title of IRS Management Official | **Date** |
| Name and Title of IRS Resolution Official | **Date** |
| Name of Aggrieved's Representative | **Date** |

Form 13571 (4-2004)   Catalog Number 38327C        publish.no.irs.gov        Department of the Treasury - Internal Revenue Service

Exhibit 4

11/30/2007 09:44 FAX               ☑007

FW: Mediation Confirmation. LOCATION AND TIME, 10 AM, 1111 CONSTITUTIO...    Page 2 of 2

Case 1:07-cv-01365-RBW    Document 19    Filed 11/27/2007    Page 32 of 34

**From:** Savage Eric L [mailto:Eric.L.Savage@irs.gov]
**Sent:** Friday, April 29, 2005 11:56 AM
**To:** Hamilton Gary; Falcone James P; Eder Gary
**Cc:** Kelley Linda L (Memphis); Watkins Sherdana T
**Subject:** Mediation Confirmation
**Importance:** High

This is to confirm mediation as agreed to by the parties.

**MEDIATION DATE: Monday, May 16, 2005**

**MEDIATION TIME: 10:00 a.m. 4:00 p.m.**

**LOCATION OF MEDIATION: 1111 Constitution Avenue
Washington, D.C. 20224
Conference Room 2115**

Sherdana, please coordinate with Gary Eder (Mediator) with respect to gaining entry and setting up the conference room for mediation on the above date. You can obtain the key for conference room 2115 from Earl Simpson (Office of the Commissioner- Secretary) who is located in room 2422 in the main building.

Should anyone have any questions, please contact me at 202-283-7478. Thanks !!!

*Exhibit 5*

Directions from 333 Constitution Ave Nw, Washington. DC to 2221 S Clark St ...    Page 1 of 2

# MAPQUEST



**Start:** 333 Constitution Ave Nw
Washington, DC 20001-2802, US

**End:** 2221 S Clark St
Arlington, VA 22202-3745, US

**Notes:**
Only text visible within note field will print.

## Directions

**Total Est. Time: 8 minutes**          **Total Est. Distance: 4.46 miles**          **Distance**

**1:** Start out going NORTH on 3RD ST NW toward C ST
NW.                                                                                      0.1 miles

**2:** Merge onto I-395 S (Crossing into VIRGINIA).

**3:** Merge onto US-1 S / JEFFERSON DAVIS HWY via          3.2 miles
EXIT 8C on the LEFT toward PENTAGON CITY /
CRYSTAL CITY / ALEXANDRIA.                                                0.8 miles

**4:** Turn SLIGHT LEFT onto S CLARK ST.
                                                                                          0.1 miles

**5:** End at **2221 S Clark St**
Arlington, VA 22202-3745, US

**Total Est. Time: 8 minutes**          **Total Est. Distance: 4.46 miles**

Exhibit 6

Driving Directions from 401 Courthouse Sq. Alexandria, VA to 2221 S Clark St. Arlingto... Page 1 of 2

# MAPQUEST



**Start:**   **401 Courthouse Sq**
            Alexandria, VA 22314-5701, US

**End:**     **2221 S Clark St**
            Arlington, VA 22202-3745, US

**Notes:**
Only text visible within note field will print.

## Directions                                           Distance

**Total Est. Time:** 12 minutes     **Total Est. Distance:** 4.72 miles

**1:** Start out going NORTHEAST on JAMIESON AVE          0.1 miles
toward COURTHOUSE SQ.

**2:** Turn LEFT onto DULANEY ST.                         <0.1 miles

**3:** Stay STRAIGHT to go onto DIAGONAL RD.              <0.1 miles

**4:** Turn RIGHT to stay on DIAGONAL RD.                  0.2 miles

**5:** Turn SLIGHT RIGHT onto KING ST / VA-7.             0.4 miles

**6:** Turn LEFT onto N PATRICK ST / US-1 N. Continue     3.6 miles
to follow US-1 N.

**7:** Turn RIGHT onto 20TH ST S.                         <0.1 miles

**8:** Turn RIGHT onto S CLARK ST.                         0.1 miles

**9:** End at **2221 S Clark St**
Arlington, VA 22202-3745, US

**Total Est. Time:** 12 minutes     **Total Est. Distance:** 4.72 miles

*Exhibit 7*